Frederick Lambach and Jacqueline Lambach v. Commissioner.
Lambach v. Commissioner
Docket No. 32137.
United States Tax Court
1952 Tax Ct. Memo LEXIS 270; 11 T.C.M. (CCH) 330; T.C.M. (RIA) 52094; April 4, 1952
Carl H. Lambach, Esq., 1102 Davenport Bank Bldg., Davenport, Ia., for the petitioners. William B. Springer, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income tax for the year 1946, in the amount of $674.27, against petitioners. The question presented is whether petitioner Frederick Lambach was a bona fide resident of a foreign country, or countries, during the entire year 1946, within the meaning of section 116(a) of the Internal Revenue Code, or, if that question is answered in the negative, then, are petitioners entitled to deductions for uncompensated expenses of foreign travel and subsistence away from home during *271 1946. Findings of Fact Petitioners are husband and wife residing in Omaha, Nebraska. They filed a joint return for the year 1946 with the collector of internal revenue for the first district in New York. From about 1936 until July 20, 1946, Frederick had been employed by Transcontinental & Western Air, Inc., (hereinafter called TWA). Until about 1941 his activities were mostly concerned with domestic air lines, but from that year until October 1945 he was with the Intercontinental Division. This division flew Air Transport Command planes under contract for the Army. During this period Frederick was chief meteorologist in Washington, D.C., instructing training crews for overseas operations. For a while he was also flight superintendent in Presque Isle, Maine. Thereafter he returned to Washington, D.C. and instructed again and was later sent to Stephenville, Newfoundland for about a year and a half, after which he again returned to Washington as an instructor. In May or June of 1944 he became a navigator and from that time until October 1945 flew as a navigator back and forth between Washington, D.C. and foreign ports. After World War II, TWA was given a certificate to set up *272 an international commercial airline and in October 1945 was engaged in setting up the line. In that month Frederick went to New York for TWA to set up flight control operations. In November of 1945 TWA sent Frederick to Gander, Newfoundland as flight superintendent. Gander is the hopping-off place for transatlantic flights. When Frederick went to Gander the Newfoundland Government had just taken over the air base there from the Canadians, the RAF, and the United States. At first Frederick was the only dispatcher there. Three or four months later an assistant was assigned to him. With the exception of a day and a half, Frederick remained in Gander from November 25, 1945 until June 13 or 14, 1946. By that time Frederick had accumulated six or seven weeks of leave and he returned to Alexandria, Virginia, where his wife and child were living. He never thereafter returned to Newfoundland, except to touch there later in the year on the flight which took him to Sweden. Frederick's wife, Jacqueline, went to Washington with him in 1941. They first rented a house in Alexandria, Virginia and in about 1943 moved to an apartment in Alexandria, in which they were living when they closed the *273 place in 1946 as part of their plan to go to South America, a destination which was replaced by Sweden. From 1941 until that time Jacqueline resided in Alexandria. Jacqueline and their daughter who was nine years old at the time of the hearing, never went to Newfoundland. Frederick had no written contract with TWA with respect to employment in Newfoundland where his job as flight superintendent at Gander was a so-called permanent job. His services could be terminated by either TWA or himself at any time. TWA paid his expenses from Washington to Gander and furnished transportation to him at its own expense back to the United States in June 1946. He was paid monthly on the job in Newfoundland. While Frederick was in Gander he lived in rooms in the barracks at the air base for which he paid rent. Toward the end of his stay he lived in a suite of rooms which had been converted. His rent varied between $5 and $6 a day depending upon the type of rooms he occupied. The Newfoundland Government was running the airline's mess and they had fixed hours for meals. It was necessary for Frederick to pay for meals at the mess regardless of whether or not he ate there. If he missed meals at the *274 mess it was necessary for him to purchase meals elsewhere. He received a bill at the end of each month for the mess and rent. In addition to salary while in Newfoundland, Frederick received "subsistence" from TWA in the amount of $6 per day. Frederick incurred expenses for meals and lodging in the amount of at least $1,500 over and above the subsistence allowance while in Newfoundland. He was not reimbursed for these expenses. Frederick did not keep a checking account in Newfoundland, but did maintain a checking account in Washington or Alexandria. During the time Frederick was there Gander was nothing more than an air base. It was in the wilderness with no roads leading to it, though it could be reached by train. A small chapel built by the Army and a couple of small stores were there. Social life was practically nonexistent and living quarters for families were not available, though some were contemplated eventually. Jacqueline was innoculated for typhoid on May 6, 1946, and for typhus on May 2, 1946. Their daughter was vaccinated for smallpox May 13, 1946; for typhoid April 22, 29, and May 6, 1946; and for typhus April 25 and May 2, 1946. Frederick had known Pete Redpath very *275 well for several years prior to 1946. Redpath had been with TWA. In 1946 he was vice president of Scandinavian Airlines, Stockholm, of which Swedish Intercontinental Airlines was a part. Before returning to the United States from Newfoundland Frederick had corresponded with Redpath for about two months inquiring about the possibility of a job some place other than in Newfoundland. Redpath had nothing definite to suggest, but held out the possibility of a job in connection with a project of Scandinavian Airlines for flights between Sweden, Norway, and Denmark. In a letter dated June 22, 1946 from Alexandria, Virginia, and addressed to Mr. Tore Nilert in New York City, Frederick set out his qualifications and concluded as follows: "At this time I am planning on making a change and knowing that you are starting a new operation and may be needing experienced personnel, I am enclosing a resume of my experience for your consideration." Nilert was in charge of the New York Office for Scandinavian Airlines. On or about July 2, 1946, Redpath wrote to Frederick in Alexandria and offered him employment in Stockholm, Sweden, at 20,000 crowns a year. The letter stated that Captain Lindholm *276 of Swedish Intercontinental Airlines would be in the United States later in the month to talk about arrangements. In the meantime, Frederick was also in touch, through an employment agency, with Pan American-Grace, (hereinafter called Panagra). Panagra offered him a position in Lima, Peru, which he accepted on or about July 10, 1946. The arrangement was for Frederick to leave for Lima on August 1, 1946. Panagra was to pay for transportation to Lima, but if he did not stay in Lima at least a year Panagra would not pay for his return transportation. This employment was in a more or less permanent job of indefinite duration - Panagra could dismiss him or he could terminate his employment at any time. Frederick began taking the necessary innoculations on July 10, 1946 preparatory to going to South America, and a week or so later Jacqueline was vaccinated for smallpox by a physician in Alexandria and secured a health certificate. On July 18, 1946, Frederick wrote to TWA and requested that his resignation be accepted effective July 20, the date on which his accumulated leave would expire. Captain Lindholm arrived in New York on July 31, and Frederick, after discussion with him on the *277 same day, agreed to take a position in the Operations Department of Swedish Intercontinental Airlines in Stockholm, Sweden, at 20,000 crowns a year. Panagra relieved Frederick of his obligation to go to South America. Swedish Intercontinental agreed to pay the expenses of transporting Frederick and his family to Sweden and shipping expenses for furniture and household equipment. Frederick's employment with the Swedish Intercontinental was subject to termination at any time by either party. The expenses of Frederick's transportation back to the United States in 1948 were also paid by that company. Arrangements were made for petitioners to leave for Sweden by plane on August 8, 1946. Frederick obtained the necessary clearance from his draft board for that purpose. A transfer company in Alexandria which had picked up some of petitioners' household effects and personal belongings about July 28 and which had originally been instructed to ship them to New York for reshipment to South America was instructed to pick up the remainder of the furniture and effects and to change the destination to Sweden. On August 8, 1946, petitioners and their daughter departed by air for Sweden. Before *278 September of 1948, Frederick came back to the United States several times for short periods on business. Jacqueline also came back for a month or two toward the end of 1947 and the beginning of 1948. Frederick eventually asked for assignment back to New York and was given a job there as a regional operations manager with Scandinavian Airlines, Inc. He returned to New York in September 1948 and about July 1949 went to the midwest and into another kind of employment. Frederick has paid no income taxes to Newfoundland or Sweden for 1946. He did receive a notice to pay an income tax in Newfoundland for 1946 which he turned over to his attorney in New York and with regard to which he took no further action. TWA never withheld anything from his pay for income tax purposes while he was in Newfoundland. Frederick also filed an income tax return in Sweden for 1946, but no liability has been asserted against him by that country for that year. On March 4, 1949, petitioners filed an income tax return for 1946 on which no income, no deductions, and no tax were shown. The return contained the following statement: "NO TAX - EXEMPT BY REASON OF SEC. 116, I.R.C." Frederick *279 received salary of $5,408 in 1946 entirely for personal services earned from sources without the United States. This amount was received from TWA and Scandinavian Airlines and does not include in it any per diem or subsistence payments received from TWA. In his deficiency notice respondent included in income "Salary income" in the amount of $5,408, allowed a $500 standard deduction, and gave the following explanation: "(a) Compensation received during the year 1946 for services rendered while employed in Newfoundland and Sweden is includible in taxable income under the provisions of Section 22(a) of the Internal Revenue Code. Your contention that the provisions of Section 116(a)(1) apply in respect to such compensation is denied." Frederick was not a bona fide resident of a foreign country, or countries, during the taxable year 1946. Opinion To be entitled to the exclusion provided for by section 116(a)(1) petitioners must establish first, that Frederick was a "bona fide resident" of Newfoundland from January 1, 1946 on; second, that his return to the United States on or about June 14, 1946 for the purpose of vacation and to look for other employment *280 did not deprive him of that status; and third, that he remained a bona fide resident of Newfoundland until he abandoned that status by becoming a bona fide resident of Sweden in August, in which status he remained for the remainder of the year. Petitioners fail at the outset, for Frederick's bona fide residence in Newfoundland has not been proven. The question involved is factual. Herman Frederick Baehre, 15 T.C. 236. It is not a novel problem, but being factual, it is inevitable that cases will, and have, come up which pose close questions for decision. The facts which turn a case one way or the other are often difficult to particularize. In the situation before us we note that Frederick's employment in Newfoundland was terminable by either his employer or himself; that the chances for family life at Gander at the time he was there were negligible; there were no quarters provided for families; there was no evidence that a school was available for their young daughter, and - as significant as anything is the fact that Frederick was already restive under the conditions existing at Gander when he returned to the United States in June 1946, continuing from his home in *281 Alexandria his already launched search for employment elsewhere, finding it, and never returning to Newfoundland. Frederick never really intended to make a home in Newfoundland and, in the circumstances, we are unable to find that he was a "bona fide resident" of Newfoundland during his stay there in 1946. We conclude that he was not entitled to the exclusion granted by section 116(a)(1). See Michael Downs, et al v. Commissioner, 116 Fed. (2d) 504; Arthur J. H. Johnson, 7 T.C. 1040. This brings us to the second issue - the deductibility of the unreimbursed meal and lodging expenses incurred by Frederick while in Newfoundland. These expenses, we have found, amounted to at least $1,500. Apparently, petitioners' contention is that it would be the height of inconsistency for us to find that Frederick was not a bona fide resident of Newfoundland in 1946 and at the same time to deny him a deduction for his meals and lodging while there. But this Court has indicated that there is no inconsistency in so doing in at least two cases and we think the reasoning of those cases is applicable here. Virginia Ruiz Carranza (Zuri), 11 T.C. 224; Arthur J. H. Johnson, supra, 1051, 1052. *282 True it is that Frederick maintained a home for his wife and daughter in Alexandria, Virginia, while he was in Newfoundland, but it is also true that his post of duty was in Gander and that he was stationed there for an indefinite or indeterminate time on the business of his employer. These latter facts do not necessarily make him a "bona fide resident" of Newfoundland within the meaning of 116(a). Nevertheless they do furnish the basis for determining that the expenses of his meals and lodging in Newfoundland were personal expenses for which he is not entitled to a deduction. Commissioner v. Flowers, 326 U.S. 465; John D. Johnson, 8 T.C. 303, 308. There are many other cases denying deductions for living exepenses incurred at one's post of duty away from his permanent residence but we do not think further citations are necessary. Reference can be made, however, to Bercaw v. Commissioner, 165 Fed. (2d) 521, where this principle was followed even though there were no quarters available at the post of duty to house taxpayer's family. See, also, Willard S. Jones, 13 T.C. 880. Petitioners have cited no cases on this point and have relied *283 on what we believe to be an ineffectual attempt to distinguish the Flowers case. Decision will be entered for the respondent.